IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

HERBERT LEE CANTERBURY,

     Plaintiff,

v.                                  CASE NO. 2:12-cv-00752

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Herbert Lee Canterbury (hereinafter referred to as "Claimant"), filed an application for SSI on June 13, 2008, alleging disability as of October 15, 2007, due to back, legs and knees, neck, deaf in right ear, some hearing loss in left ear, severe headaches, anxiety, and a head injury.[1] (Tr. at 13, 163-65, 167-70, 191-97, 202-10, 214-20, 229-35.) The

---

[1]    On January 18, 2007, Claimant protectively filed applications for disability insurance benefits [DIB] and SSI payments alleging disability beginning May 1, 2005. The claims were initially denied on April 20, 2007. The claimant's insured status expired on June 30, 2007. The claimant would not submit for consultative examination. There is no evidence to indicate Claimant filed an appeal of the determination. On June 13, 2008, Claimant filed applications for DIB and SSI, alleging disability beginning October 15, 2007. The Title II claim was technically denied because Claimant was not insured. The Title XVI claim was denied initially on August 25, 2008, and upon reconsideration on November 19, 2008.

claim was denied initially and upon reconsideration.  (Tr. at 13, 81-85, 88-92, 93-95.)  On January 15, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 96.)  The video hearing was held on November 17, 2009 before the Honorable Theodore Burock.  (Tr. at 30-62, 106, 113.)  A supplemental video hearing was held on May 12, 2010.  (Tr. at 63-77, 134, 141.)  By decision dated July 23, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-25.)  The ALJ's decision became the final decision of the Commissioner on January 21, 2012, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-6.)  On March 19, 2012, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the

impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of cervical spine impairment, lumbar spine impairment, shoulder impairment, post-traumatic arthritis, headaches, and hearing impairment.  (Tr. at 15-18.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 18.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 18-24.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 24.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as sorter/inspector

3

and assembler which exist in significant numbers in the national economy.  (Tr. at 24-25.)

On this basis, benefits were denied.  (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 38 years old at the time of the administrative hearing. (Tr. at 38.)  He has an eighth grade education.  (Tr. at 40, 237.)  Records indicate he repeated the eighth grade and was absent 43 days of that school year.  (Tr. at 239.)  In the past, he worked as a laborer in the construction industry.  (Tr. at 55, 69.)

4

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Health Evidence</u>

Records indicate Claimant had multiple self-admissions to Boone Memorial Hospital Emergency Department [ED] beginning July 9, 2005. (Tr. at 281-608.) The vast majority of the records predate Claimant's onset date of October 15, 2007. (Tr. at 281-537, 566-75.) These records show Claimant's presentations were primarily for complaints of pain: low back, legs, head (altercation in which he was struck in the head with a rock), foot injury (stepped on a nail on March 8, 2006 and December 8, 2006), dental pain, left flank pain (kidney stone), abdominal, prostate, and right shoulder. <u>Id</u>. Claimant also had 2-inch laceration to his left hand. (Tr. at 508-09.)

On July 14, 2005, Jerry Quisenberry, PA-C, Boone Memorial Hospital ED, diagnosed with a "left renal calculi [kidney stone]." (Tr. at 408, 535.)

On January 17, 2006, a CT scan of Claimant's abdomen was performed at Boone Memorial Hospital wherein J. L. Leef, Jr., M.D., radiologist, stated: "Unremarkable CT of the abdomen...CT images of the pelvis demonstrate no evidence of pelvis ascites. No inflammatory processes are identified." (Tr. at 494.)

On March 31, 2006, Claimant presented to the Boone Memorial Hospital ED with complaints of back pain stating "wants pain meds." (Tr. at 360.) Claimant tested positive for "benzo [benzodiazepine], cocaine, THC [cannabis compound], opiates, and TCA [tricyclic antidepressant]" and was diagnosed with "drug abuse." (Tr. at 359-63.) Notes indicate: "Pt [patient] admits to cocaine and pot use this week." (Tr. at 360.)

On December 9, 2006, notes from Boone Memorial Hospital indicate Claimant "states doctor was 'rude and slanderous' to him...I won't be back when that doctor's here. Of course I'm in pain.  I work every damn day."  (Tr. at 338.)

On January 29, 2007, a CT scan of the cervical spine at Charleston Area Medical Center [CAMC], was "[n]ormal...No evidence of acute bony injury."  (Tr. at 302.)  A CT scan of the head found "[n]o evidence of acute intracranial injury."  (Tr. at 304.)

On February 20, 2007, a brain MRI at Boone Memorial Hospital was negative: "The study appears to be within normal limits.  Diffusion images are unremarkable."  (Tr. at 297.)

On April 19, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 255-63.)  The examiner, Curtis Withrow, M.D., stated Claimant's primary diagnosis as "pain, low back-left leg", secondary diagnosis as "renal calculus", and other impairments as "HA [headache]; substance abuse".  (Tr. at 255.)  He found Claimant had no exertional, postural, manipulative, visual, communicative or environmental limitations. (Tr. at 256-59.)  Dr. Withrow concluded:

> The claimant's allegations are supported by multiple outpatient visit and hosp [hospital] treatment for 'chronic low back pain' with clinical evidence of lumbar muscle tenderness and restricted straight leg raising on the left; However, other clinical lab. [laboratory] evidence to support a specific diagnosis and limitation of physical function are lacking.  There is evidence of multiple substance abuse.  His credibility is questionable.
>
> *       *       *
>
> The claimant does not present evidence of a significant limitation of physical functional work activity.

(Tr. at 260, 262.)

Records indicate Claimant was treated at Lincoln Primary Care Center on September

17, 2007 and October 15, 2007 for an on-the-job back injury that occurred October 10, 2004. (Tr. at 757-58.) On October 15, 2007, notes show the center requested authorization for an MRI of the lumbar spine. (Tr. at 756.)

Claimant was treated at Webster County Memorial Hospital Emergency Department of October 16, 2007 for a right shoulder injury. (Tr. at 264-69.) Notes indicate: "36 yowm [year old white male] construction worker injured his right shoulder doing heavy masonry work at 4:30 PM yesterday. He states he lost his footing and grabbed a block wall with his right hand, resulting in right shoulder pain." (Tr. at 266.) Dennis M. Burton, M.D., radiologist, stated: "Three views of the right shoulder show no radiographic evidence of bone or soft tissue abnormality. If concern of injury persists, MRI of the region is recommended." (Tr. at 269.)

On October 30, 2007, December 28, 2007, January 28, 2008, February 26, 2008, and April 10, 2008, Walter E. Dial, M.D., followed up with Claimant regarding his right shoulder injury. (Tr. at 270-75.) He prescribed Vicodin, Flexeril, Corcet, and Motrin for the injury and stated that Claimant was "off work." Id.

On December 11, 2007, Andrew J. McDonnell, M.D., Boone Memorial Hospital, reviewed a right shoulder MRI: "IMPRESSION: Tear of the posterior-inferior labrum is seen with an adjacent cyst as noted. The anterior labrum appears unremarkable. There is mild tendinosis changes seen at the supraspinatus tendon. No definite rotator cuff tear is seen." (Tr. at 538.)

Records show Claimant's right shoulder injury was found to be a compensable work injury and that he was "disabled from working from 1/29/08 through…5/9/08." (Tr. at 782-91.)

7

On February 6, 2008, Stanley S. Tao, M.D. evaluated Claimant upon referral by Dr. Dial.  (Tr. at 276-78.)  Dr. Tao recommended physical therapy for the right shoulder for eight weeks.  (Tr. at 278.)

Records indicate Claimant had twelve physical therapy sessions for his right shoulder at Boone Memorial Hospital from February 12, 2008 to March 13, 2008.  (Tr. at 576-601.)

On March 25, 2008, Dr. Tao stated: "Overall still symptomatic.  Options discussed. Given failure with therapy will request for surgery.  Authorization request from Workers' Compensation: right shoulder arthroscopy, posterior labral repair, acromioplasty and 4 months of therapy."  (Tr. at 280, 795.)

Records indicate Claimant was a patient at West Virginia Spine and Pain Clinic on six occasions from April 11, 2008 to September 9, 2008 for right shoulder pain.  (Tr. at 704-31.)  Although the handwritten notes are largely illegible, records indicate Claimant was prescribed Lortab and Xanax on each occasion and Roxicodone on one occasion by Weixing William Guo, M.D.  (Tr. at 704, 706, 708, 716, 717, 720, 723.)

On April 28, Dr. Tao stated that Claimant was scheduled for "right shoulder scope with acromioplasty and posterior labral repair DATE: 5-16-08."  (Tr. at 792, 794.)

On May 6, 2008, Claimant presented to Boone Memorial Hospital ED with complaints of a left knee injury due to "jumping over hill to miss car."  (Tr. at 602-04.) Aous Al-Khaldi, M.D. reviewed an x-ray of the left knee and concluded: "Multiple projections reveal no definite acute fracture, dislocation or subluxation.  The visualized bony structures appear unremarkable.  IMPRESSION: Negative study."  (Tr. at 606.)

On May 7, 2008, Claimant was flown to CAMC following a motor vehicle accident in Boone County.  (Tr. at 624-80.)  The admitting physician, Frank C. Lucente, M.D. stated:

8

This 36-year-old-white male was involved in a motor vehicle accident in Boone County, apparently lost control of his vehicle and was thrown from the vehicle, was combative at the scene, unconscious with moaning and groaning, rapid sequence intubation was done by Health Net and he was flown to CAMC. He had on arrival in the Emergency Room at CAMC, his airway was in place with good CO2 exchange and oxygenation. He was tachycardic but blood pressures in the 120s to 130's. Report from EMS that was that he was moving all extremities and got combative. The first order of care was that there was hemorrhage involving multiple facial lacerations along the temporal area on the right hand side and over the frontal area right around the eyebrow which required suture control. This was done by Dr. Shoudi, the resident. Following this, again the airway and breathing was intact. Fast exam was done by Dr. McCagg under my observation which revealed that there was good view of the spleen and liver. Cardiac windows with no evidence of intraabdominal hemorrhage. Blood gases were obtained using the routine trauma protocol. An OG-Lube was placed. The patient was put on a ventilator...He remained stable in the Emergency Room.

REVIEW OF SYSTEMS: A quick look at the systems revealed that he had multiple contusions, particularly on the right side of the body. There was contusions of the chest wall as well as the upper abdomen on the right hand side. He had knee abrasions, contusions and punctato lacerations of the lower legs. There was a what appeared to be a knee immobilizer on the left lower leg. The patient remained unconscious during his stay in the Emergency Room. Chest x-ray was obtained which revealed good OG-Lube and ET-Lube placement. Oral contrast was therefore given for CT scan evaluation. Pelvic film was reviewed and revealed no evidence of a fracture. A quick shoot of the left leg where the knee brace was revealed that there was transverse patella fracture. No tibial or fibular injury or femoral injury at that level. Pulses were intact in all of the extremities. There was no evidence of any joint instability. The patient remained stable in the Emergency Room. He was taken over to the CT scan where a CT of the head, face, neck, abdomen, and chest were done as well as the pelvis. CT of the head revealed multiple facial abrasions and facial fractures. OMF will be consulted for that. There is a small epidural hematoma which neurosurgery will be consulted. His chest revealed that there what appears to be atelectasis or mucus plug or even clot that was causing atelectasis at the right posterior lower bases on the CT scan however the aorta was normal, the heart was normal and there was no evidence of pneumothorax. The CT of the abdomen revealed no visceral organ injury. The pelvis appeared to be okay. The kidneys lit up with contrast and the ureters. The patient while in the CT scan got combative and required further sedation and paralytics to complete the evaluation. He will be taken to the intensive care unit and consultants will include orthopedics, maxillofacial as well as neurosurgery. His lacerations will be repaired and he will be monitored for his head injury.

(Tr. at 626.)

On May 7, 2008, Robert J. Crow, M.D., neurological surgeon, CAMC, stated in a

consultative summary regarding Claimant's head injury:

> CHIEF COMPLAINT: Closed head injury with facial fractures and right
> anterior middle fossa extraaxial collection, neurosurgically well...A head CT
> was obtained showing multiple facial fractures as well as a small right
> anterior middle fossa epidural...the nurses relate to me that he has been eye
> opening spontaneously, moving all limbs grossly symmetrically, and
> following specific commands.  There has been no evidence of CSF leak from
> the nose or ears...By report he does have a history of polysubstance abuse...

> IMPRESSION: 1.  Closed head injury with minimal right anterior middle
> fossa extraaxial collection, neurosurgical well.

(Tr. at 628-29.)

On May 7, 2008, Robert J. Crow, M.D., neurological surgeon, CAMC, stated in a

consultative summary regarding Claimant's neck injury:

> CHIEF COMPLAINT: Neck pain after trauma with radiographic question of
> cervical spine injury, stable neurosurgically...

> His radiographic workup was felt to show question of C5 and C6 lamina
> fractures and, therefore, we were asked to see him in regards to that...CT of
> the cervical spine is reviewed and in my opinion shows no evidence of definite
> bony or soft tissue injury.  The radiologists previously have read the question
> of a fracture involving the right C6 facet as well as questions of fractures
> involving the right C5 and right C6 lamina and the right C7 transverse
> process.  Again, I see no definite evidence of these fractures, however, in my
> opinion, there may be a fracture involving the right interior C6 facet...

> IMPRESSION: 1. Neck pain after trauma, new onset, cervical musculoskeletal
> strain versus acute bony or soft tissue injury.

(Tr. at 630-31.)

On May 10, 2008, Dr. Lucente stated in a CAMC discharge summary:

> DISCHARGE DIAGNOSES: Multiple facial lacs, epidural hematoma, C6
> fracture, C5 fracture, nasal septal fracture, fracture of the sphenoid, right
> zygotic arch fracture, right orbital fracture, polysubstance abuse well as left

patellar fracture.

HOSPITAL COURSE: Patient was initially admitted to the ICU.  He was maintained in a C-collar for C5-C6 fracture, somewhat arouseable.  He was continued with epidural evaluation by Dr. Crow, who did feel that he needed evacuation.  He had a left patellar fracture which Dr. Pierson was seen and he was maintained immobilization.  It was felt the patient could be transferred to step-down.  Patient was transferred to step-down.  The patellar fracture was nonoperatively treated.  Facial lacs have been repaired as well as also epidural hematoma was being followed by Dr. Crow was nonoperative treatment.  On 05/09/2008, patient was in step-down.  It was felt that he be transferred out to the floor.  MRI was ordered of his cervical spine.  The patient's cervical spine and cervical cord canal appeared to be unremarkable.  There was no _____ defect.  Patient had been walking without assistance.  No numbness or tingling in his upper extremities.  The patient was seen by neurosurgery and it was felt that the patient could probably be discharged.

DISPOSITION: The patient was discharged home to follow up with Dr. Crow in 4 weeks.

DIET: Regular.

ACTIVITY: Touch toe weightbearing, left leg.

DISCHARGE INSTRUCTIONS: Keep the collar on at all times.  No alcohol or aspirin, no driving until seen for follow-up appointment.

DISCHARGE MEDICATIONS: He was given Percocet, Colace and Xanax.

(Tr. at 624.)

On July 3, 2008, Claimant presented to CAMC ED with complaints of "hurting all over."  (Tr. at 609-23.) Leon S. Kwei, M.D., stated:

This is a 36-year-old male who arrived at the Emergency Department via EMS from home.  He was involved in a MVC [motor vehicle collision] approximately two months ago for which he was ejected requiring intubation.  He sustained epidural hematoma, C5-C6 fracture and multiple facial fractures.  He apparently did not have any operative interventions.  He now complains of intermittent discomfort everywhere including his head and chest area.  No abdominal pain per say.  He has had dizziness but no syncope.  He has had memory loss, poor impulse control.  He has been out of pain medications for approximately several weeks...
He is out of Lortab and Xanax...

11

DIAGNOSTIC STUDIES: CT scan of the head: No acute intracranial changes seen.  Chest x-ray: No acute changes seen...

CLINICAL IMPRESSION: Post-concussive syndrome.

DISPOSITION: DC [discharge] home.  Vicodin 5 mg...no refills.  Phenergan 12.5 mg...Follow up with Family Medicine or Family Care in 1 week.

(Tr. at 609-610.)

On August 6, 2008, a State agency medical source attempted to complete a Physical Residual Functional Capacity Assessment.  (Tr. at 681-88.)  The evaluator, Angela Gross-Crowder, concluded: "Clmt [claimant] failed to return his completed questionnaires.  Clmt did not respond to any correspondence.  Clmt's 3rd party did not respond.  There is insufficient medical evidence to assess this claim."  (Tr. at 688.)

On November 13, 2008, a State agency medical source attempted to complete a Physical Residual Functional Capacity Assessment.  (Tr. at 681-88.)  The evaluator, Rabah Boukhemis, M.D., concluded:  "Prior RFC done on 8/6/08 insufficient evidence then. There is no new medical evidence.  Insufficient evidence."  (Tr. at 739.)

On January 14, 2010, a State agency medical source completed a Consultative Examination Report.  (Tr. at 769-80.)  The evaluator, Stephen Nutter, M.D. concluded:

**IMPRESSION**:
1.    Chronic Cervical and Lumbar Strain.   There is no evidence of radiculopathy.
2.    Post traumatic arthritis.

**SUMMARY**: This 38 year old male claiming disability due to neck pain and joint pain.  The claimant reports problems with his back and neck.  There are range of motion abnormalities of the cervical and lumbar spine as noted above.  Straight leg raise test is limited as noted above.  There is muscle weakness as noted above.  These finding are not consistent with nerve root compression.

The claimant reports problems with joint pain.  As noted above, there is joint

pain and tenderness.  There is no synovial thickening, periarticular swelling, nodules or contractures consistent with rheumatoid arthritis.

(Tr. at 772.)

Dr. Nutter completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  (Tr. at 774-79.)  He marked that Claimant could occasionally lift/carry 21 to 35 pounds, frequently lift/carry 11 to 20 pounds, and continuously lift/carry up to 10 pounds.  (Tr. at 774.)  These limitations were due to "back and neck pain; joint pain." Id.   He marked that Claimant could "at one time without interruption" sit for 3 hours, stand for 2 hours, and walk for one hour.  (Tr. at 775.)  He marked that Claimant, in an 8 hour work day, could sit four 4 hours, stand for 3 hours, and walk for 2 hours.  Id. He marked that Claimant did not require the use of a cane to ambulate. Id. Regarding "use of hands" and "use of feet", Dr. Nutter marked that Claimant could "continuously" do all actions with both hands and both feet, save for reaching overhead with his right hand, which he could do "frequently." (Tr. at 776.) Regarding postural activities, he marked that Claimant could "frequently" climb stairs and ramps and balance; and could "occasionally" climb ladders or scaffolds, stoop, kneel, crouch, and crawl.  (Tr. at 777.)  He marked that Claimant could "continuously" tolerate exposure to all environmental conditions save for unprotected heights, extreme heat and vibrations, which Claimant could "occasionally" tolerate.  (Tr. at 778.)  He marked "yes" to all questions regarding Claimant's ability to do activities.  (Tr. at 779.)

Mental Health Evidence

On April 19, 2007, a State agency medical source attempted to complete a Psychiatric Review Technique form.  (Tr. at 241-54.)  The evaluator, Holly Cloonan, Ph.D., concluded:

"clmt [claimant] did not return forms or keep ce [consultative examination].  No response from 3rd party.  INSUFFICIENT EVIDENCE D/T [due to] CLAIMANT'S FTC [failure to communicate/comply]."  (Tr. at 253.)

On August 21, 2008, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 689-703.) The evaluator, James Binder, M.D., concluded: "Clmt did not return completed questionnaires.  Clmt has not responded to any correspondence.  Clmt's 3rd party has not responded."  (Tr. at 701.)

On November 14, 2008, a State agency  medical source completed a Psychiatric Review Technique form. (Tr. at 741-54.) The evaluator, Holly Cloonan, Ph.D., concluded: "Clmt did not return completed questionnaires.  Clmt has not responded to any correspondence. Clmt's 3rd party has not responded. Insufficient evidence due to claimant's FTC [failure to communicate]."  (Tr. at 753.)

On August 20, 2009, Richard S. Morgan, M.A., and Penny Perdue, M.A., Psychological Assessment and Intervention Services, Inc., completed a psychological evaluation of Claimant.  The evaluators concluded:

> Mr. Canterbury is a 37 year old, single, unemployed, white male.  He is 5'8" tall and weighs 185 pounds.  He has black hair with a beard and moustache, brown eyes and appeared his stated age.  He was casually dressed.  Grooming and personal hygiene was fair.  He walked with a normal gait and maintained a normal posture.  He had fair use of all limbs and is right handed.  He had no apparent vision problems during the evaluation.  He had mild hearing problems.  Speech production was good with normal rate and normal volume.  No speech problems were noted.  His friend drove him to the interview.  Mr. Canterbury was appropriate and related fairly well.  He was cooperative.
>
>                              *          *          *
>
> Mr. Canterbury reports he has had chronic pain for the last couple years following an auto accident in either 2007 or 2008 (he reports he is unsure of the date of the accident)...He denies any physical or cognitive problems prior to the accident.  He reports he is unable to recall two weeks prior and several weeks after the accident suggestive of retrograde and anterograde amnesia.

No third party interview or record review was able to be conducted.

* * *

Mr. Canterbury reports he does not use alcohol or illicit drugs...

Mr. Canterbury reports no prior mental health treatment.  He does report getting some Klonopin from his family doctor and Boone Memorial Hospital...

Mr. Canterbury began school in kindergarten and attended public school.  He was placed in regular education classes.  He received below average grades.  He thinks he had to repeat the second or third grade.  He got along well with others and denies any behavior problems.  He dropped out in the 8th grade because he did not like school.  He has had no other formal education.

* * *

As a child, Mr. Canterbury describes himself as "alright."  He had a few close friends and he denies any behavioral problems.  He reports no family problems.  Mr. Canterbury is single.  He has never been married but has two children.  He has no current girlfriend...Mr. Canterbury reports no current legal problems.  He reports a history of being...arrested for driving on a revoked license.

**MENTAL STATUS EXAMINATION**:
**Orientation** - He was inattentive throughout the evaluation.  He was oriented to person, place but not to time or date.
**Mood** - Observed mood was anxious.
**Affect** - Affect was consistent.
**Thought Processes** - Thought processes appeared logical and coherent.
**Thought Content** - There was no indication of delusions, obsessive thoughts or compulsive behaviors.
**Perceptual** - He reports no unusual perceptual experiences.
**Insight** - Insight was fair.
**Judgment** - Average based on his response to the finding the letter question.  He stated "mail it."
**Suicidal/Homicidal Ideation** - He reports no history of violent acts.  He denies suicidal and homicidal ideation.
**Immediate Memory** - Immediate memory was within normal limits.  He immediately recalled 4 of 4 items.
**Recent Memory** - Recent memory was moderately impaired.  He recalled 2 of 4 items after 20 minutes.
**Remote Memory** - Remote memory was mildly impaired based on inability to provide some basic background information.
**Concentration** - Concentration was poor as he was unable to do serial 3's or spell his first name backwards.
**Psychomotor Behavior** - Psychomotor retardation was noted.

## INTELLECTUAL ASSESSMENT

Mr. Canterbury was administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III).  Results from the WAIS-III follow.

| Scale | Standard Score | 90% Confidence Interval |
|---|---|---|
| Verbal IQ | 64 | 61-69 |
| Performance IQ | 66 | 53-64 |
| Full Scale IQ | 57 | 54-61 |

| | |
|---|---|
| Verbal Comprehension Index | 65 |
| Perceptual Organization Index | 62 |

| Verbal Subtests | Standard Score | Performance Subtests | Standard Score |
|---|---|---|---|
| Information | 4 | Picture Completion | 4 |
| Digit Span | 4 | Picture Arrangement | 2 |
| Vocabulary | 3 | Block Design | 4 |
| Arithmetic | 3 | Matrix Reasoning | 2 |
| Comprehension | 5 | Digit Symbol-Coding | 2 |
| Similarities | 4 | | |

| | |
|---|---|
| Mean Verbal Subtest Standard Score | 4 |
| Mean Performance Subtest Standard Score | 3 |

## WAIS-III VALIDITY

### Internal Validity

Rapport was easy to establish and maintain.  He was reserved but cooperative during testing.  He was relaxed and comfortable.  He recalled and understood directions however some instructions had to be repeated.  He maintained a consistent level of effort during the testing.   He required constant encouragement.  Motor behavior was significantly slowed.  Speech was easy to understand.  He had no vision problems.  He had some hearing problems in his right ear.  He worked as a slow pace.  Attention/concentration was poor.  His mood appeared to have no effect on performance.

### External Validity

Mr. Canterbury dropped out in the 8th grade because he did not like school.  He was placed in regular education classes.  He received below average grades.  He had to repeat second or third grade.  He reports he has had no other formal education.   His employment...was as a house construction, bricklayer, and timber worker.

### Overall Validity

Overall, results from the WAIS-III are considered valid and suggest intellectual functioning within the Mild Mental Retardation Range.  There

was no significant difference between scores on the Verbal and Performance Scales. This is thought to be the result of his sustained head injury and occurred post his 18th birthday therefore mental retardation will not be diagnosed.

**OBSERVED FINDINGS**
Mr. Canterbury exhibits an anxious mood and consistent affect. Thought processes were logical and coherent. Immediate memory was within normal limits. Recent memory was moderately impaired. Remote memory was mildly impaired. Attention/concentration was poor. Psychomotor retardation was present.

**DIAGNOSTIC IMPRESSION**
AXIS I:          294.9          Cognitive Disorder NOS
AXIS II:         799.9          Deferred
AXIS III:    By self-report:    Chronic   pain, amnesia, headaches, hearing loss in right ear

**RECOMMENDATIONS**
Mr. Canterbury would benefit from the use of a medical card to seek more intensive neuropsychological testing, treatment and assessment to better evaluate his cognitive impairments and limitations.

(Tr. at 760-64.)

Claimant's School Records

Boone County School records indicate Claimant received A, B and C grades in grades one through five, save for one D grade in music in fifth grade. (Tr. at 237.) In grades 6 through 8, Claimant received C, D and F grades, save for one B grade in physical education in eighth grade and one B grade in Related Arts in seventh grade. Id. Records indicate he repeated the eighth grade and was absent 43 days of that school year. (Tr. at 239.)

Claimant's Challenges to the Commissioner's Decision

Claimant's attorney did not file a brief. When he filed a request for Appeals Council review of the ALJ's decision, he wrote the following: "The claimant has a valid I.Q. scores of verbal (64), performance (66), FS [Full Scale] (57). These scores were said to be valid by

17

a DHHR [Department of Health and Human Resources] evaluator, Richard Morgan, M.A.,

Penny Perdue, M.A.  The claimant also has fractures (multiple) of the skull from a MVA

[Motor Vehicle Accident].  He meets Listings 12.05 & 12.01." (Tr. at 6.)  The undersigned

will consider these points.

The Commissioner's Response

  The Commissioner did not file a brief because Claimant's attorney did not file a brief.

The court will assume that the Commissioner would argue that the ALJ's decision was

supported by substantial evidence.

Analysis

  12.01 Category of Impairments - Mental describes the ten categories of mental

impairments and their criteria: 12.02 Organic Mental Disorders; 12.03 Schizophrenic,

Paranoid and Other Psychotic Disorders; 12.04 Affective Disorders; 12.05 Mental

Retardation; 12.06 Anxiety Related Disorders; 12.07 Somatoform Disorders; 12.08

Personality Disorders, 12.09 Substance Addiction Disorders, and 12.10 Autistic Disorder

and Other Pervasive Developmental Disorders.

  Listing 12.05A requires a showing of dependence upon others for personal needs and

inability to follow directions, such that the use of standardized measures of intellectual

functioning is precluded, initially manifested during the developmental period; i.e., the

evidence demonstrates or supports onset of the impairment before age 22.

  Listing 12.05B requires a valid verbal, performance, or full scale IQ of 59 or less,

initially manifested during the developmental period; i.e., the evidence demonstrates or

supports onset of the impairment before age 22.

  In order to meet the criteria of Listing 12.05C, the regulations require that Claimant

must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2007); see also § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria). Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2007).

Listing 12.05D requires a valid verbal, performance, or full scale IQ of 60 to 70, resulting in at least two of the following: marked restriction of daily activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration, initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The ALJ made these findings regarding the consultative evaluation of licensed psychologists Morgan and Purdue, as well as Claimant's credibility:

> After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> Based on the consultative evaluation done on August 20, 2009, licensed psychologists Richard Morgan, M.A., and Penny Perdue, M.A., recorded their

19

diagnostic impression of cognitive disorder, NOS. The claimant reported he has an eighth-grade education with retention in second or third grade. Mr. Canterbury denied any previous mental health treatment. The claimant's primary care provider prescribes Klonopin, a psychotropic medication. The claimant was cooperative; insight was fair; judgment was average; and immediate memory was within normal limits. The claimant's concentration was poor; recent memory was moderately impaired; remote memory was mildly impaired; mood was anxious; and psychomotor retardation was noted. On the Wechsler Adult Intelligence Scale-III, the claimant attained the following IQs: Verbal IQ 64, Performance IQ 66, and Full Scale IQ 57. The psychologists noted that a diagnosis of mild mental retardation was not rendered because the claimant sustained a head injury after his 18th birthday (Exhibit 13F). The undersigned rejects the results of the intelligence testing as inconsistent with other evidence of record. In Exhibit 15F, Dr. Nutter noted the claimant's intelligence functioning seemed normal and his recent memory and remote memory were good (Exhibit 15F). The undersigned notes the claimant provided rather extensive information during his evaluation with Dr. Nutter. The undersigned concedes that Dr. Nutter is not a psychiatrist or psychologist and he was not evaluating the claimant's cognitive functioning. However, it would be expected that a physician would comment if he were examining an individual who presented as functioning as low as the claimant did at IQ testing. The psychologists noted the claimant's motor behavior was significantly slowed and he required constant encouragement during intelligence testing, which raises questions to the validity of the results. Additionally, there was no such motor slowing noted by Dr. Nutter (Exhibit 15F). In addition, medical records subsequent to the motor vehicle accident do not include any comments in regard to the claimant's cognitive functioning being significantly impaired.

At the hearing on November 17, 2009, Mr. Canterbury testified he has trouble remembering. However, on January 14, 2010, Dr. Nutter reported the claimant's recent memory and remote memory were good (Exhibit 15F).

The record includes inconsistent statements by the claimant regarding alcohol and drug use. Medical records from Stanley Tao, M.D., show the claimant denied alcohol use but reported using marijuana (Exhibit 4F). On January 19, 2007, the claimant denies drug addiction (Exhibit 5F). On August 20, 2009, the claimant denied use of alcohol and illicit drugs (Exhibit 13F). On January 14, 2010, the claimant denied alcohol or drug use to Dr. Nutter (Exhibit 15F). However, the record shows multiple trips to the emergency room of Boone Memorial Hospital and Charleston Area Medical Center with pain complaints. The claimant reported at these visits he was "out of medications" (Exhibits 5F and 6F). Also, the claimant presented to two different treating sources, West Virginia Spine and Pain Clinic and Lincoln Primary Care Center with complaints of pain. The record shows only

20

one visit to Lincoln Primary Care Center and only two visits to West Virginia Spine and Pain Clinic. The claimant was prescribed pain medications by both sources (Exhibits 9F and 12F). Additionally, the record includes a number of positive urine drug screens from Boone Memorial Hospital (Exhibit 5F, pages 79 and 126); and from Charleston Area Medical Center (Exhibit 6F, pages 50 and 64). The drug screens were positive for barbiturates, benzodiazepines, cocaine, marijuana, and opiates (Exhibits 5F and 6F).

At the hearing on November 17, 2009, Mr. Canterbury reported difficulty walking and standing. The claimant stated he has to stop one or two times when walking 100 yards. He later stated he walks down the hill to visit his neighbor. The claimant testified he walks or hitchhikes to get places.

At the hearing on November 17, 2009, the claimant stated he completed the eighth grade. School records show the claimant attended through the eighth grade; he received good grades through fifth grade (Exhibit 10E). In Exhibit 13F, the claimant reported he quit school in the eighth grade because he did not like school. He reported being retained in the second or third grade (Exhibit 13F). The school records do not support his alleged retention (Exhibit 10E).

As discussed previously in the decision, the claimant testified that his daily activities include watching television, helping his mother [with] household chores, taking out the garbage, visiting a friend or neighbors, seeing his children on the weekends, and straightening his bedroom. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. He stated he sees his children (ages seven and nine) on the weekends from Friday to Sunday. The claimant is apparently able to care for young children at home, which can be quite demanding both physically and emotionally, without any particular assistance.

\*        \*        \*

At the hearing, the claimant alleged significant limitation and symptoms as a result of his mental condition. The record shows the claimant has received very little treatment for a mental impairment. He was prescribed a psychotropic medication by his primary care provider but he sought no treatment from a mental health provider. The claimant alleges problems with his memory. However, the record shows his recent memory and remote memory were good and his intellectual functioning was normal (Exhibit 15F). The record shows the claimant did not put forth full effort during a psychological evaluation (Exhibit 13F). The claimant testified to a variety of daily activities including caring for his two young children from Friday to Sunday and visiting his friends and neighbors. He was able to provide extensive information to Dr. Nutter at a consultative examination (Exhibit

21

15F). The undersigned finds the claimant's testimony regarding his mental functioning is not entirely credible and is inconsistent with the evidence of record.

As for the opinion evidence, in April 2007, a state agency non-examining reviewing psychologist concluded there was insufficient evidence to render an assessment of the claimant's mental condition. The claimant did not submit to a consultative examination (Exhibit 1F). The reviewing psychologist did not have the benefit of reviewing the other medical reports contained in the current record. Therefore, the undersigned gives little weight to this opinion.

In April 2007, a state agency reviewing physician concluded the claimant has no severe physical impairments (Exhibit 2F). The reviewing physician did not have the benefit of reviewing the other medical reports contained in the current record. Therefore, the undersigned gives little weight to this opinion.

In August 2008, a state agency non-examining reviewing physician concluded there was insufficient evidence to render an assessment of the claimant's mental condition (Exhibit 8F). The reviewing physician did not have the benefit of reviewing the other medical reports contained in the current record. Therefore, the undersigned gives little weight to this opinion.

In August 2008, a single decision maker for the state agency concluded there was insufficient evidence to render an assessment of the claimant's physical abilities (Exhibit 7F). The single decision maker did not have the benefit of more recent medical evidence. The single decision maker's opinion is given consideration in conjunction with the other evidence of record. However, the undersigned gives no weight to this opinion.

In November 2008, a state agency reviewing physician concluded the claimant has no severe physical impairments (Exhibit 10F). The reviewing physician did not have the benefit of reviewing the other medical reports contained in the current record. Therefore, the undersigned gives little weight to this opinion.

In November 2008, the state agency non-examining reviewing psychologist concluded there was insufficient evidence to render an assessment of the claimant's mental condition (Exhibit 11F). The reviewing psychologist did not have the benefit of reviewing the other medical reports contained in the current record. Therefore, the undersigned gives little weight to this opinion.

On January 14, 2010, Dr. Nutter completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). Dr. Nutter opined the claimant can lift 35 pounds occasionally and 20 pounds frequently; he can sit

for four hours in an eight-hour day, three hours without interruption; he can stand for three hours in an eight-hour day, two hours without interruption; he can walk for two hours in an eight-hour day, one hour without interruption; he can frequently (defined as one-third to two thirds of the day) reach overhead with his right upper extremity; he can occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl; he can frequently climb stairs and ramps and balance; he can tolerate occasional exposure to unprotected heights and vibration (Exhibit 15F). The undersigned gives significant weight to Dr. Nutter's opinion, as consistent with other evidence of record and hereby incorporates them in the residual functional capacity above.

(Tr. at 20-24.)

As previously discussed, in order to meet this listing, Claimant must have had mental retardation before age 22. Mental retardation is a life long condition and "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant." Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989) (citing Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985)).

In Luckey, the Fourth Circuit held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Id. at 669. A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c) (2007). In Luckey, the Court ruled that

Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C. Further, the [Commissioner] has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The [Commissioner's] finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Luckey, 890 F.2d at 669.

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," see 20 C.F.R. § 416.925(a) (2011), regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532 (1990). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See id. at 531.

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the

24

individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The court proposes that the presiding District Judge find that the ALJ properly considered Claimant's credibility and weighed his subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause his alleged symptoms. (Tr. at 20.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 20-24.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, Claimant's treatment, and his broad range of self-reported daily activities. Id. The ALJ fully explained his reasons for not finding the IQ testing of August 20, 2009 to be valid. (Tr. at 20-21.) The undersigned notes that the ALJ had the opportunity to personally observe Claimant's health, intelligence, and veracity at two hearings on November 17, 2009 and May 12, 2010. (Tr. at 30-62, 63-77.) Also, the ALJ arranged for Claimant to have a consultative orthopedic examination on January 14, 2010. (Tr. at 61, 769-80.) The ultimate decision about disability rests with the Commissioner. 20 C.F.R. § 416.927(e)(1) (2011).

Further, Claimant has not shown that he had mental retardation before age 22 as required in order to meet Listing 12.05. This listing does not address those issues of a low IQ acquired later in life. Listing 11.18 is the listing for traumatic brain injury (TBI). Listing 11.18 refers to evaluation criteria contained in other mental and neurological impairment listings. TBI is evaluated under the criteria contained in the convulsive and non-convulsive epilepsy listings, 11.02 and 11.03, , the listing for central nervous system vascular accident (CVA, or stroke), 11.04, and the organic brain disorders listing, 12.02. The medical evidence of record does not show that Claimant has had convulsive and non-convulsive epilepsy, a central nervous system vascular accident or a stroke, or the development of an organic mental disorder since his head injury in the MVA in May 2008.

For the reasons set forth above, the undersigned proposes that the presiding District Judge **FIND** that the Commissioner's decision denying benefits to the plaintiff is supported by substantial evidence. It is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation

to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  February 20, 2013  
          Date

Mary E. Stanley  
United States Magistrate Judge